IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RAYMOND MATHIS, #140252,              )
                                       )
        Plaintiff,                     )
                                       )
                                       )
    v.                                 )    CIVIL ACTION NO. 1:08-CV-412-MHT
                                       )                [WO]
                                       )
SHERIFF ANDY R. HUGHES, et al.,        )
                                       )
        Defendant.                     )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This cause of action is pending before the court on a 42 U.S.C. § 1983 complaint

filed on June 2, 2008 by Raymond Mathis ["Mathis"], an inmate currently incarcerated in

the state prison system and frequent litigant before this court.  In the instant complaint,

Mathis asserts the defendants lodged a false sanction against him and deprived him of due

process with respect to the punishment imposed for this sanction.  He further argues the

defendants denied him adequate medical treatment for hemorrhoids during his confinement

in the Houston County Jail in May of 2008.  Mathis names Andy R. Hughes, the sheriff of

Houston County, Alabama, Keith W. Reed, commander of operations at the Houston

County Jail, and Sgt. Kim Turner and officer John Harrison, correctional officers for the

jail, and Jason Smoak, a certified physician's assistant employed by the jail, as defendants

in this cause of action.  Mathis seeks a hearing on the sanction, removal of the sanction

from his county inmate file and any other available relief. *Plaintiff's Complaint - Court Doc. No. 1* at 4.

The defendants filed a special report and supporting evidentiary materials addressing the claims presented in the complaint. Pursuant to the orders entered herein, the court deems it appropriate to treat the defendants' report as a motion for summary judgment. *Order of October 29, 2008 - Court Doc. No. 25.* Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's responses in opposition to the report/motion, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine issue of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine issue material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial.").  A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.

---

[1]Effective December 1, 2007, "[t]he language of Rule 56 [was] amended ... to make the rule[] more easily understood and to make style and terminology consistent throughout the rules.  These changes ... are stylistic only." Fed.R.Civ.P. 56 Advisory Committee Notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior rule remain equally applicable to the current rule.

*Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).  Consequently, to survive the defendants' properly supported motion for summary judgment, Mathis is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e)(1), *Federal Rules of Civil Procedure*.  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted."  *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory

assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will

5

preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906

F.2d 667, 670 (11ᵗʰ Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, Mathis fails to demonstrate a requisite genuine issue of material fact in order to preclude summary judgment.  *Matsushita*, *supra*.

## III.  DISCUSSION

### A.  Suit Against Defendants in Their Official Capacities - Absolute Immunity

To the extent Mathis sues the defendants in their official capacities, they are immune from monetary damages.[2]  Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity."  *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11ᵗʰ Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v.*

---

[2]Under all facets of Alabama law, a county sheriff, his jailers and medical staff act as state officers "when supervising inmates and otherwise operating the county jails."  *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285, 1289 (11ᵗʰ Cir. 1998); *see* Ala. Const. Art. V, § 112 (designates sheriff and, by extension, his staff as members of State's executive department); *see also Parker v. Amerson*, 519 So.2d 442 (Ala. 1987) (county sheriff is executive officer of the State).

7

*Monroe County*, 116 F.3d 1419, 1429 (11ᵗʰ Cir. 1997).

In light of the foregoing, it is clear that the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11ᵗʰ Cir. 1994). Thus, the defendants are entitled to absolute immunity from any claims for monetary relief presented against them in their official capacities. *Parker v. Williams*, 862 F.2d 1471 (11ᵗʰ Cir. 1989).

## B.  Relevant Factual History[3]

Mathis possesses an extensive criminal history including voluminous convictions before the state courts of Houston County, Alabama beginning in the 1980's and

---

[3]The pleadings before the court indicate that the actions which form the basis of the instant complaint occurred after Mathis' incarceration pursuant to a sentence of confinement imposed by the Circuit Court of Houston County, Alabama arising from his conviction for a criminal offense. Thus, the complaint relates to purported constitutional violations that occurred during Mathis' status as an inmate serving a sentence imposed by a state court. Nevertheless, regardless of Mathis' status in the jail, either as a pre-trial detainee or sentenced inmate, the applicable standard of review remains the same. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11ᵗʰ Cir. 1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11ᵗʰ Cir. 1996) (citations omitted) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.... However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11ᵗʰ Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492 (1986) (For analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment.); *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539 (11ᵗʰ Cir. 1994) (observing that "[w]hether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial."). It is therefore likewise clear that the applicable standard of reviewing claims by pre-trial detainees or sentenced prisoners under the Fourteenth Amendment's Due Process Clause is the same such that case law involving convicted inmates applies equally to actions involving pretrial detainees.

continuing until the filing of this case.[4]  In 2005, Mathis entered the Houston County Jail on a charge of third degree burglary and on an offense for first degree receiving stolen property for which an indictment had issued against Mathis on December 3, 2004.  *See Mathis v. Glover, et al.*, Civil Action No. 1:05-CV-1084-MHT-TFM (M.D. Ala. 2008), *Defendants' Exhibit D - Court Doc. No. 18-15* at 1- 4.  A grand jury returned an indictment against Mathis for the burglary offense on June 10, 2005.  *Id*. at 2.  This previous court record further demonstrates that Mathis entered a guilty plea to the third degree burglary charge on March 29, 2006 and the trial court imposed a sentence of four (4) years imprisonment for this conviction.  The records before the court in the present civil rights action likewise establish Mathis entered a guilty plea to receiving stolen property on November 16, 2005 and received a sentence of three (3) years imprisonment for this offense.  *Defendants' Exhibit G - Court Doc. No. 24-6* at 27, 29.[5]  The state court awarded Mathis 228 days of jail credit for time served in the county jail on this offense, ordered the sentence split with Mathis to serve 15 months imprisonment with the "balance of [s]aid sentence suspended on the condition of good behavior and payment of all fines, costs and restitution for a period of 24 months at $50 per month [to] begin Jan. 15, 2006."  *Id*. at 29.

---

[4]The records of this court in the numerous cases filed by Mathis establish his criminal history.  This court takes judicial notice of its own records.

[5]The trial court did not delineate this sentence as a concurrent sentence, and, therefore, under applicable state law, the sentence at the time of imposition is a consecutive sentence to any other imposed term of incarceration.  *Ala. Code* § 14-3-38(a) ("When a convict is sentenced to imprisonment in the penitentiary on two or more convictions, unless it is specifically ordered in the judgment entry that such sentences be served concurrently, such sentences shall be cumulative and shall be served consecutively ... beginning on the expiration of the preceding term.").  Thus, the sentence for receiving stolen property ran consecutive to all prior sentences imposed upon Mathis.

Mathis subsequently secured his release from confinement on these charges.

On October 31, 2007, the trial court issued an alias warrant of arrest for Mathis in his receiving stolen property case. *Defendants' Exhibit G - Court Doc. No. 24-6* at 20. The court based this warrant on the failure of Mathis to complete various conditions of his suspended sentence and his failure to appear at a show cause hearing with respect to his unsuccessful completion of such conditions. *Id.* On November 1, 2007, law enforcement officials arrested Mathis on several charges of third degree burglary and returned him to the Houston County Jail. On November 7, 2007, Mathis was arrested on the alias warrant while incarcerated at the Houston County Jail. *Id.* at 22. On February 20, 2008, the court determined Mathis had "willfully failed and refused to pay his fines and costs" with respect to the conditions pertaining to suspension of his receiving stolen property sentence and therefore ordered Mathis to "serve his fines and costs associated" with this conviction in the Houston County Jail. *Id.* The trial court ordered this term of incarceration to last for one year. *Id. - (Docket Entry of July 3, 2008)*. It is therefore clear that as of February 20, 2008 Mathis' confinement in the jail related, at least in part, to the sentence imposed for his conviction for receiving stolen property. This sentence had not yet expired as the trial court suspended the remaining split portion of the sentence pending payment of costs and fines, conditions with which Mathis failed to comply. In addition, the four-year sentence imposed on March 26, 2006 for third degree burglary remained in effect.

## C.  The False Sanction Claim

10

On May 18, 2008, defendant Harrison issued a sanction against Mathis for his violation of Rule #3, placing paper over a cell window. Mathis asserts the sanction resulted from false accusations and fabrications by the defendants because he alleges he did not place the paper over the window. The defendants maintain that the sanction occurred solely due to Mathis' violation of institutional rules governing inmate behavior. *Defendants' Exhibit 2 (Affidavit of John Harrison - Court Doc. No. 24-2* at 2 ("On May 18, 2008, at approximately 2312, during my initial counts of Pods I and J, I found the window of cell door I-5 to have it's (sic) view obstructed by two sheets of paper on the inside of the window such that I could not see into [the] cell. The inmate assigned to I-5 [at this time] was inmate Mathis. Inmate Mathis was in violation of Rule #3...."); *Defendants' Exhibit P Part 2 - Court Doc. No. 24-8* at 41 (Inmate Sanction/Restriction Documentation Dated May 18, 2008) (The door window of Mathis' cell had its "view obstructed by two sheets of paper... in violation of Rule #3."). It is therefore clear that the defendants do not admit that the information contained in the sanction is either fabricated or false.

In *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991), the Court held that reliance on **_admittedly false information_** to deny a prisoner consideration for parole was arbitrary and capricious treatment violative of the Constitution. The appellate court carefully distinguished its holding from its prior decision in *Slocum v. Georgia State Bd. of Pardons and Paroles*, 678 F.2d 940 (11th Cir.), *cert. denied*, 459 U.S. 1043 (1982).

Our holding today does not conflict with our earlier holding in

11

*Slocum*, *supra*. In *Slocum*, the plaintiff, who had been denied parole, made the conclusory allegation that the Board must have relied upon erroneous information because otherwise the Board would surely have granted him parole.  *Slocum*, 678 F.2d at 941. The plaintiff then sought to assert a due process right to examine his prison file for the alleged errors.  Unlike the instant case, in *Slocum* the state did not admit that it had relied upon false information in denying parole nor did the plaintiff present any evidence that his prison file even contained any false information. We held in *Slocum* that prisoners do not state a due process claim by merely asserting that erroneous information may have been used during their parole consideration.  *Id.* at 942. We also determined that prisoners do not have a due process right to examine their prison files as part of a general fishing expedition in search of false information that could possibly exist in their files.  *Id.* In the case at bar, we are confronted with prison authorities who admit that information contained in Monroe's files is false and that they relied upon such information, at least in part, to deny Monroe parole and to classify him as a sex offender. As we stated, the parole statute does not authorize state officials to rely on knowingly false information in their determinations. *Thomas [v. Sellers]*, 691 F.2d [487] at 489 [(11th Cir. 1982)].

*Monroe*, 932 F.3d at 1442.

Slocum controls the disposition of the instant case.  The defendants maintain that the information on which they relied in imposing the sanction is correct and an accurate representation of the plaintiff's behavior on May 18, 2008.  Moreover, there is no evidence before the court that the defendants relied on information they knew to be false during any stage of the sanction process.  Specifically, there is no admission by any of the defendants that the information utilized in levying the sanction against Mathis is false, incorrect or erroneous.  The record in this case therefore establishes that the defendants did not rely on

*admittedly* false information.  In light of the foregoing, the plaintiff is entitled to no relief as a matter of law and summary judgment is due to be granted in favor of the defendants on his false sanction claim.

### D.  Due Process Claims

1.  Failure to Comply with Administrative Policy.  Mathis appears to maintain the defendants deprived him of due process when they failed to provide him a disciplinary hearing on his inmate sanction in violation of the administrative requirements set forth in the rules/policies of the Houston County Jail.  The defendants deny this assertion and maintain the rules in effect at the time of this offense did not require a hearing for imposition of the challenged sanction.  Nevertheless, the alleged violation of departmental rules or policies does not assert a violation of plaintiff's constitutional rights.  *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995); *Harris v. Birmingham Board of Education*, 817 F.2d 1525 (11th Cir. 1987).

2.  Placement in Segregation.  Mathis argues the defendants deprived him of due process because they placed him in lock down/segregation for his creation of a security hazard without a hearing.  The sanction required that Mathis serve "14 days [on] lock down."  *Defendants' Exhibit P Part 2 - Court Doc. No. 24-8* at 41 (Inmate Sanction/Restriction Documentation Dated May 18, 2008).  The evidentiary materials before the court establish that inmates in disciplinary segregation at the Houston County Jail lose various privileges and are not allowed to participate in rehabilitative programs

offered by the jail during such confinement.  Inmates in disciplinary segregation are, however, permitted to practice their religion, provided necessary medical treatment, receive the same food as other inmates, retain mail privileges and receive all necessities.

Defendant Reed describes the sanction process and nature of confinement in the jail with respect to an inmate's status as follows:

> Segregation resulting from a sanction with a few exceptions mirrors the conditions imposed upon inmates in administrative segregation and protective custody segregation in the Jail....
>
> ***
>
> At the time of the events made the basis of plaintiff's complaint, the primary distinctions between a sanction and a disciplinary proceeding in the Jail is that sanctions are:  (1) usually used as corrective administrative discipline for offenses that are not to be treated as serious offenses for disciplinary proceedings; (2) sanctions are <u>not</u> made a part of the inmate['s] permanent record that is sent to the Alabama Department of Corrections and as such, sanctions do <u>not</u> have the stigma of wrongdoing or misconduct that is associated with more serious disciplinary confinement which is made a part of the inmate['s] permanent records with the state such that the inmate may be placed on lock down in the state prison system and/or may result in the inmate being classified as a higher risk inmate for purposes of facility and housing assignment by the state; and (3) the lock down time resulting from a sanction is more limited than for a disciplinary proceeding against an inmate.  As a result, an inmate sanction does not affect the inmate['s] term or duration of confinement with the county or state.  Because a sanction is not made a part of an inmate['s] state incarceration record, a sanction does not impact an inmate['s] "good time" credit and does not impact an inmate's eligibility for parole.  Lock down resulting from a sanction is for a definite period of time not to exceed 21 days.  Disciplinary segregation resulting from a disciplinary proceeding usually results in the inmate receiving segregation time up to a maximum of 45 days for each offense with a maximum of 60 days for all violations resulting from a single incident....
>
> The "Sanction" system in the Houston County Jail ("Jail") serves and effectuates jail management and inmate safety and security while in the Jail

without making an inmate['s] rule violation a part of his/her permanent record with the state prison system.   Unlike segregation following disciplinary proceedings, segregation via a sanction does not carry with it any stigma of wrong doing or misconduct, and that part of an inmate['s] file is not sent to the state prison system such that it affects the inmate['s] classification and treatment in the state prison system....  Sanctions are used as a regulatory tool to maintain safety and security for all inmates and corrections officers and to maintain good order and discipline in the jail for inmates, corrections officers and visitors....

        ***

By design, all of the Jail is a maximum security facility.  All of the cells in the jail have the same amenities and living conditions.

The conditions at the Jail involve significant amounts of "lock down time" even for inmates in the general population.   General population inmates are confined to their cells for fifteen (15) hours each day.  Other than visitation with their lawyer(s), all visits for all inmates in the Jail are non-contact visits made through glass walls/windows.  In the jail, every aspect of all inmates lives whether in general population or in segregation is monitored.  All of the cell doors in the Jail are solid metal doors.  Jail cells, except in the medical clinic, in both general population areas and segregation areas have windows where inmates can see outside the Jail facility and every cell door has a window allowing inmates to see out into the day room area of the Pod at all times.   Inmates in the general population of the jail are permitted to eat in the day room area of each Pod in the jail or in their cells according to the inmate['s] preference.

.... The sanction [for covering the cell door window] was issued in order to administratively enforce the administrative and regulatory rules of behavior for inmates in the jail.   The purpose of inmate Mathis' segregation/lock down made the basis of his claims was administratively to maintain necessary control, maintain discipline, maintain good order, maintain security and to provide for the safety of inmates, corrections officers and others who may be visiting within the Jail.  Sanctions are issued administratively according to the procedures stated above.  The purpose of sanctions and any resulting loss of privileges is to maintain control and discipline by controlling the behavior of inmates in a systematic way to obtain obedience, compliance with rules and to maintain good order and safety in the jail....  The purpose of sanctions in the Jail, including inmate Mathis' sanction, is to regulate the behavior of inmates in the jail for the purposes stated herein, not to punish.

\*\*\*

The housing for inmates in segregation, whether for administrative sanction, disciplinary, other administrative and protective custody, is the same.  While on lock down, inmates are allowed out of their cells for one hour each day to bathe and exercise in the day room area of the Pod.  During the time inmates are on lock down, whether administrative sanctions/disciplinary or other administrative purposes, inmates can talk to and converse with other inmates in the Pod.  When confined to their cells, lock down inmates can talk to each other....

*Defendants' Exhibit 4 (Affidavit of Keith W. Reed) - Court Doc. No. 24-5 at 3-8.*

The Due Process Clause of the Fourteenth Amendment provides that no state "shall deprive any person of life, liberty, or property without due process of law."  Thus, the Constitution is implicated only if a person is deprived of an interest protected by the Due Process Clause.  In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court abandoned the former methodology for determining the existence of a liberty interest.  Under such previous case law, a federal court ascertained whether a state created a constitutionally protected liberty interest by parsing language of statutes and regulations to determine if the language constituted "an unmistakably mandatory character" placing "substantive limitations on official discretion."  In its renunciation of this prior case law, the Court held that federal courts must instead look to the nature of the deprivation rather than statutory or regulatory language to determine if a state created a liberty interest.

Following *Wolff*,[6] we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause....  But these interests will be generally

---

[6]*Wolff v. McDonnell*, 418 U.S. 539 (1974).

16

> limited to freedom from restraint which, while not exceeding
> the sentence in such an unexpected manner as to give rise to
> protection by the Due Process Clause of its own force, ...
> nonetheless imposes atypical and significant hardship on the
> inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, 515 U.S. 472, 483-484 (1995)(footnote added)(citations omitted).

Moreover, the Court specifically rejected the contention that any action taken by

correctional officials as a punitive measure encroaches upon a liberty interest protected

under the Due Process Clause. *Id.* at 484.

"Discipline by prison officials in response to a wide range of misconduct falls within

the expected parameters of the sentence imposed by a court of law." *Sandin,* 515 U.S. at

485. The loss of privileges and placement in segregation for a short period of time "though

concededly punitive, do[] not represent a dramatic departure from the basic conditions" of

the sentence imposed upon the plaintiff. *Id.* Moreover, under the facts of this case, the

aforementioned sanctions fail to "impose[] atypical and significant hardship on the inmate

in relation to the ordinary incidents of prison life." *Id.* at 484. Thus, Mathis' theory of

liability under the law as established in *Sandin* is without merit, and summary judgment is

due to be granted in favor of the defendants on the due process claims.

### E.  Medical Treatment for Hemorrhoids - Deliberate Indifference

Mathis complains the defendants failed to provide him adequate medical treatment

for hemorrhoids. *Plaintiff's Complaint - Court Doc. No. 1* at 3. The defendants deny they

acted with deliberate indifference to Mathis' hemorrhoids and, instead, maintain they

provided Mathis with appropriate treatment for his condition.

To prevail on a constitutional claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that those responsible for providing the treatment acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, jail personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989). When seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a

18

serious condition, not just knowledge of symptoms, and ignore known risk to serious

condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure

to alleviate a significant risk that he should have perceived but did not, while no cause for

commendation, cannot under our cases be condemned as the infliction of punishment."

*Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate
> indifference, ... the Supreme Court has ... emphasized that not 'every claim
> by a prisoner that he has not received adequate medical treatment states a
> violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at
> 291; *Mandel,* 888 F.2d at 787.  Medical treatment violates the eighth
> amendment only when it is 'so grossly incompetent, inadequate, or excessive
> as to shock the conscience or to be intolerable to fundamental fairness.'
> *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence
> or malpractice do not rise to the level of constitutional violations.  *See
> Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not
> become a constitutional violation merely because the victim is a prisoner.');
> *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not
> sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033
> (mere medical malpractice does not constitute deliberate indifference).  Nor
> does a simple difference in medical opinion between the prison's medical
> staff and the inmate as to the latter's diagnosis or course of treatment support
> a claim of cruel and unusual punishment.  *See Waldrop,* 871 F.2d at 1033
> (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  Moreover, "whether government

actors should have employed additional diagnostic techniques or forms of treatment 'is a

classic example of a matter for medical judgment' and therefore not an appropriate basis

for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir.

1995); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact that

prison inmate desires a different mode of medical treatment does not amount to deliberate

indifference violative of the Constitution); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir.

2001) ("A difference of opinion as to how a condition should be treated does not give rise

to a constitutional violation."); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981)

(prison medical personnel do not violate the Eighth Amendment simply because their

opinions concerning medical treatment conflict with that of the inmate-patient).

> To be deliberately indifferent, Defendants must have been "subjectively
> aware of the substantial risk of serious harm in order to have had a
> "'sufficiently culpable state of mind."'" *Farmer,* 511 U.S. at 834-38, 114
> S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-
> 25, 115 L.Ed.2d 271 (1991)....  Even assuming the existence of a serious risk
> of harm and causation, the prison official must be aware of specific facts
> from which an inference could be drawn that a substantial risk of serious
> harm exists--and the prison official must also "draw that inference." *Farmer*,
> 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2001).  Thus, for Mathis to survive

summary judgment on his deliberate indifference claim against the defendants, he is

"required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the

defendants' deliberate indifference to that risk; and (3) causation."  *Hale v. Tallapoosa*

*County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

The medical records filed herein demonstrate that during Mathis' confinement in the

Houston County Jail correctional officials allowed Mathis unlimited access to medical care

and medical personnel consistently provided treatment to Mathis for his hemorrhoids in

accordance with their assessment of his condition.  *Defendant's Exhibit A to the Affidavit of Jason Smoak (Houston County Jail Medical File of Raymond Mathis) - Court Doc. No. 24-12 thru Court Doc. No. 24-15*.  The undisputed evidentiary materials before the court further demonstrate that the jail's medical staff routinely examined Mathis, thoroughly evaluated his complaints, ordered necessary tests, prescribed various medications, referred him to a free-world gastroenterologist for evaluation and provided treatment for his hemorrhoids in accordance with their professional judgment.  *Id*.; *Defendant's Exhibit 5 (Affidavit of Jason Smoak) - Court Doc. No. 24-11* at 2-16.  Smoak provides the following summary of ,medical treatment provided Mathis with respect to the claim presented in the instant complaint:

> In his complaint in this lawsuit, inmate Mathis claims that he was moved to cell I-5 for medical reasons.  That statement is false.  In his complaint, inmate Mathis claims that on Sunday May 18, 2008, at the time he was sanctioned, that he had been "bleeding bad" and that "[Due] to the fact that I was bleeding for two day and couldn't stop it, I just stay on my bed and hope to see a nurse that never came and the third day I was taken to [the medical clinic] for treatment."  I can state to a reasonable degree of medical certainty that this claim is also false.  I saw inmate Mathis in the jail medical clinic on Friday, May 16, 2008, for his sole complaint of sinus congestion.  On ... May 16, 2008, inmate Mathis did not have any complaints with regard to hemorrhoids and exhibited no signs and symptoms of having any current hemorrhoid problems at that time.
>
> Over the [following] weekend, the jail medical clinic was staffed by a nurse and either myself or Dr. Banner were on call at all times for the jail medical clinic staff.  Inmate Mathis made no claims of any kind that his hemorrhoids were ... bleeding until he was sanctioned for covering up the window of his cell with paper.
>
> On Monday, May 19, 2008, I again saw inmate Mathis in the jail medical

21

clinic for his subjective complaint that his hemorrhoids would bleed upon defecation. Upon physical examination, I found no signs or symptoms of any external hemorrhoids or that inmate Mathis had been bleeding. His hemorrhoids did not show signs of bleeding. Inmate Mathis' subjective complaints of bleeding were not supported by my objective physical examination or his blood test. As a matter of caution, I continued the current treatment of inmate Mathis by keeping him on Preparation H and Colace (stool softener) twice a day. Because inmate Mathis insisted that he had bled profusely over the weekend, I had blood drawn for lab work (CBC). Inmate Mathis' blood test was within normal limits.

On June 9, 2008, when the jail medical staff attempted to give inmate Mathis additional Preparation H suppositories, inmate Mathis left the clinic and he refused them by saying that he didn't want "sh--." At no time while in the Houston County Jail has inmate Mathis presented with more than a minimal hemorrhoidal irritation on my physical examination.

*Defendant's Exhibit 5 (Affidavit of Jason Smoak) - Court Doc. No. 24-11* at 14-16.

The affidavit filed by defendant Smoak further addresses Mathis' claim before this court with respect to the treatment provided for hemorrhoids, in detailed pertinent part, as follows:

In addition to funding three full time nurse positions; one Certified Medical Assistant ("CMA"); one full time Certified Physician's Assistant ("PA"); a doctor contracted as the Clinic Medical Director and staff doctor; and, a registered supervising pharmacist for the provision of medical care to inmates such as the plaintiff, the [Houston] County Jail provides a general medical clinic for medical problems that may arise in the jail. The medical clinic is held daily, Monday through Friday. The jail also has a nurse or CMA on duty on Saturdays and Sundays. The clinic is staffed by the staff physician and/or myself as the Certified Physician's Assistant under the supervision of the physician. The nurses or CMA are in the Pods each day passing out inmate medications as well. Thus, inmates are given daily access to either the doctor, [physician's assistant], nurses or CMA services and the general medical clinic as well as the hospital emergency room services, if necessary. Either I or the doctor are "on call" to the jail on a 24 hour a day, seven days a week, basis.

It is the policy of the Houston County Jail that all requests for medical treatment are forwarded to the jail's medical staff with the expectation that appropriate and necessary medical treatment will be provided to or obtained for the inmate.

The jail medical staff is committed to providing needed medical treatment to every inmate. Based on my treatment to the plaintiff and my review of the plaintiff's jail medical file, the plaintiff was, during the period of time made the basis of Plaintiff's complaint, provided all necessary medical testing, treatment and care while in the Houston County Jail. At all times alleged in Plaintiff's Complaint, he has been given and provided adequate and necessary medical treatment and has at all times relevant thereto been provided with all medically necessary medications. Inmate Mathis has presented with numerous subjective complaints many of which could not be objectively verified.

Inmate Mathis' most recent incarceration in the Houston County Jail began November 1, 2007.... All reasonable and necessary medical treatment has at all times been provided to inmate Mathis. A summary of the medical treatment provided to the plaintiff [relevant to the claim presented in the instant complaint] is provided as follows:

Nov. 5, 2007:  Inmate Mathis came into the jail from the emergency room of the Southeast Alabama Medical Center (SAMC). Orders from SAMC were reviewed and followed [including provision of blood pressure, hemorrhoid and anti-infection medications]. [Specifically, Mathis] was prescribed Colace 100 mg by mouth at night and placed on a high fiber diet to help with his hemorrhoids....

Nov. 7, 2007:  Inmate Mathis was allowed to call home for his ... medications (i.e. blood pressure, allergy and pain medication). No medications were

obtained from his home so he was put on a Cold Pack twice a day for five days for his cold symptoms.

Nov. 9, 2007:        Inmate Mathis was seen in [the medical] clinic ... with subjective complaints [including depression] ... muscle spasm across right upper back for two weeks - hurts to lay on right side. Tooth ache on right lower side.... [Medical personnel prescribed] Trazodone 50 mg by mouth twice a day for 14 days. ... Flexeril 10 mg by mouth twice a day for 14 days [as treatment for muscle spasm].  For tooth ache - salt water gargle and placed on dental list to see dentist.

***

Nov. 20, 2007:      Inmate Mathis was seen in [the medical] clinic with complaints of sinus congestion.  Inmate Mathis was given a Cold Pack to be taken by mouth twice a day for 5 days. Inmate Mathis also wanted an extra mat but due to no objective signs indicating a need for same, I denied his request for an extra mat at that time.

***

Jan. 15, 2008:      Inmate Mathis was seen in [the medical] clinic for complaints that his hemorrhoids have acted up and that inmate claims to have seen some bleeding on tissue when wiping.  Objectively, no active

24

bleeding observed upon examination. Inmate was treated as follows:

He was given Preparation H suppositories for 10 days, stool softener, Colace 100 mg, twice a day for 10 days then back down to once a day. I also prescribed that the plaintiff take a Sitz bath daily for 10-15 minutes for 10 days. He was to return to clinic in two weeks.

Jan. 17, 2008:     Inmate Mathis to [medical] clinic for Sitz bath with warm water. No verbal complaints noted.

Jan. 18, 2008:     Inmate Mathis to [medical] clinic for Sitz bath. No verbal complaints.

***

April 2, 2008:     Inmate Mathis was seen in [the medical] clinic for multiple complaints. Inmate's chief complains [this day] were of back pain, shoulder pain, constipation and hemorrhoids. As treatment, inmate was given Preparation H suppositories, Colace 100 mg by mouth twice a day and Milk of Magnesia every morning for three days for constipation [and hemorrhoids]. For his complaint of right shoulder pain, inmate was given an analgesic muscle rub cream.

April 14, 2008:    Inmate Mathis was seen in [the medical] clinic with multiple complaints; right shoulder pain, neck pain, hemorrhoids, runny nose and blood pressure. [An examination of Mathis relative to his complaints occurred.]... For hemorrhoids, [medical personnel] put him on Preparation H.

***

May 19, 2008:    Inmate Mathis was seen in [the medical] clinic for complaint of hemorrhoids bleeding upon defecation. Upon examination, inmate exhibited no objective signs and symptoms of bleeding. Inmate was given Preparation H suppositories, continued on Colace twice a day and had blood drawn for lab work (i.e. CBC) to be sure inmate was not anemic from reported bleeding.

June 9, 2008:    Inmate Mathis was seen in clinic with subjective complaints of feeling dizzy and he was worried about his blood pressure. Inmate's blood pressure was within normal limits. Inmate also requested a Cold Pack. I explained to inmate that he could not have one at this time as he showed no signs and symptoms of having a cold. Inmate then requested suppositories. When medical staff attempted to give them to inmate as he left the clinic, he stated that

26

the didn't want "sh--."

June 12, 2008:    Inmate Mathis was seen in clinic complaining of profuse bleeding from his rectum and states that we are not doing anything to help.... Upon rectal examination by Dr. Banner, no fissures noted, positive skin tag, no rectal prolapse, minimal hemorrhoids noted, hemacult stool was negative for presence of blood. Dr. Banner gave orders for Sitz baths twice a day for two weeks, steroid cream to rectum after Sitz bath[s], continue Colace....

June 14, 2008:    Inmate Mathis was seen in clinic for Sitz bath. Inmate requested suppository before leaving the clinic and also asked for salt. Inmate was given one Preparation H suppository and told inmate that he would not be given any more salt or suppositories unless he first wrote a request for same. Explained to inmate what the procedure is to write a request for items such as suppositories and salt. Inmate became agitated saying that "I can get anything I want." Inmate returned to Pod and will repeat sitz bath. At 6:15 p.m., inmate returned to clinic for Sitz bath and tolerated it well.

June 15, 2008:    Inmate Mathis was seen in clinic for Sitz bath and tolerated it well.

27

Repeat of Sitz bath at 6:35 p.m. today and inmate tolerated it well.

June 18, 2008:    According to records, inmate was seen in clinic for twice a day Sitz baths. Inmate was angry and stated that he had only had one Sitz bath yesterday and that he should have his Sitz bath[] whenever he gets ready for it. Inmate states that "I want to go back to the Pod. I should get that Sitz bath whenever I want it." Inmate refused his Sitz bath and when offered a refusal form inmate says, "I am not signing a refusal form and I want to go back to the Pod." Refusal witnessed by corrections officer Smith. Will offer Sitz baths tomorrow.

June 20, 2008:    Inmate Mathis was brought to clinic for repeat CBC blood test. Inmate complains of congestion and hemorrhoids. On physical examination no apparent distress noted. Blood drawn and sent to lab. Plan for Allergic rhinitis, Inmate given Benedryl 50 mg. every morning for 30 days. For hemorrhoids, Preparation H suppositories given and the plastic Sitz bath basin was given to inmate to take to his cell with him.

***

August 11, 2008:    Inmate Mathis was seen in clinic

28

[with several subjective complaints and] also asking for suppository.... [For treatment of] Hemorrhoids - ordered ... appointment to be made [for Mathis] with [a free-world] Gastroenterologist for second opinion related to inmate['s] hemorrhoids. Inmate Mathis was scheduled to see Dr. Diavolitsis (gastroenterologist) on August 27, 2008 at 2:00 p.m.

\*\*\*

August 30, 2008:    I received a call from Dr. Banner about inmate Mathis having given a large assembly of [Mathis' prescribed] medicine to another inmate ... who took at least six (6) Claritin at one time.  That inmate was brought to the clinic and stated he had received that medicine from inmate Mathis.... Inmate Mathis' Claritin, Flexeril, Trazadone, Naprosyn all were discontinued at that time.  Inmate Mathis [was] sent to administrative segregation.

August 31, 2008:    I received a call from Sgt. Bonin stating that [another] inmate ... took more than twenty (20) Tylenol at once which he received from inmate Mathis. [This other inmate] reported that inmate Mathis had additional Tylenol in his sock....

29

Sept. 3, 2008:  Inmate Mathis was seen in the clinic regarding his medications [and the necessity of crushing his blood pressure medication because of his hoarding other medications]. Inmate Mathis continues to refuse his medications stating that he has to see us crush them in front of him. Inmate Mathis was informed he had the right to refuse his medications but that his medications would continue to be made available to him. Inmate Mathis refused his AM medications today and yesterday. Inmate Mathis refused to sign a refusal form regarding same. Suppository was given to him for his hemorrhoids.

*Defendants' Exhibit 5 (Affidavit of Jason Smoak) - Court Doc. No. 24-11* at 3-14. Smoak's synopsis of the treatment provided to Mathis is supported by the medical records filed in this case and there is nothing before the court which undermines the validity of these records.

Under the circumstances of this case, it is clear that the course of treatment undertaken by the defendants was neither grossly incompetent nor inadequate. Although Mathis asserts he should have been provided a different treatment regimen for his hemorrhoids, this assertion fails to establish deliberate indifference. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to

demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545 (whether medical personnel "should have employed additional ... forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment). It is undisputed that Mathis received significant medical treatment as dictated by objective evaluations of his condition. Based on well settled law cited herein, his mere desire for a different mode of medical treatment does not amount to deliberate indifference. Mathis has failed to present any evidence which indicates the defendants knew the manner in which medical personnel treated his hemorrhoids created a substantial risk to his health and that with this knowledge consciously disregarded such risk. The record is devoid of evidence, significantly probative or otherwise, showing that the defendants acted with deliberate indifference to Mathis' complaints of hemorrhoids. Consequently, summary judgment is due to be granted in favor of the defendants. *Carter*, 352 F.3d at 1350.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before  September 9, 2010 the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

32

Done this 23rd day of August, 2010.


/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE